The decree of the court was delivered by Chancellor James, as follows :
The decree states the substance of the bill and answer. Also, that the defendant had pleaded the statute of limitations. The court having considered the argument- of council on that point, declined giving their judgment upon it, until the)’- had considered the merits of the case on defendant’s answer; (See p. 48.) *
In the examination of this case, it is necessary to consider, first, the decretal order of this court for the sale of the lot in question, (sold by the master) and the general usage *633 of it in such cases. 2d. Whether the master in this case has been guilty of such misfeasance as to make him liable, either in his ministerial or judicial capacity. From the nature of the case, these grounds arc difficult to separate. It appears that the decretal order of the 2d of April, 1785', did not express any particular terms on which the master was to sell the lot; nor did it point out any particular security which he was to take. The instructions are general, u that the lot on East-Bay be sold,” thereby leaving it in the breast of the master to consult the true interest of the estate, and to take such security as was consistent with the general usage of the court. Now it is well known that the chances of a good sale are diminished by requiring personal security. The court therefore generally leaves the terms to the parties interested, as the best judges of their own advantage. Therefore the court considers the master as left to his own discretion to demand personal security or not. It is objected however, that as the master had made the giving personal security, the terms of sale in his advertisement of his property, (then in this matter he acted judicially) it was not in his power to depart from those terms. If the premises were true, they might warrant the conclusion. But on reference to the advertisement, it appears that besides the lot in question, the master advertised for sale, the whole of E. Fenwicke’s property, (of which the lot was part) on a credit of twelve months, with interest and good securities; and these words may apply to all the deeds to be taken from purchasers (which is the most obvious meaning) or to the lot alone. This brings it to a mere dispute about words, which being general, may imply bond and mortgage, which in common acceptation, is deemed good securities, as the master did in this case.
It is also objected, that in this transaction, there whs gross neglect of the' complainant’s interests, and not the same circumspection as in his own affairs.
But the most wary are often deceived. It has been proved that: die, lot brought a high price, on account of a *634 rage for purchasing at that time in that quarter of the town, of which it was the masters duty to avail himself for the be-nefrt of the estate, It has been proved that the house of J„ and W. Simpson was in good repute ; and the master states in his answer, tliat for some time he had William. Simpson’s promise of his own, and his brother Jonathan’s bond and mortgage. It is: said that the master let the matter rest till June, 1788 — (3 years.) This is true, but a bill of the Simpson’s tras pending in the court from May, 1786 to December 1787, to establish a discount for the buildings they had erected on the lot, of which respect-áble counsel thought favorably : and the master swears he apprehended an injunction, if he proceeded pending those proceedings. During all this time, Jonathan Simpson was in New-York, out of the reach of the court, and the master was still deceived by the promises of Win. Simpson. Had the master been here alone to attend to the business, or had he acted solely on it, there might have been a plausible ground to make him responsible, • But there were parents, (the mother and ,her second husband) trustees, legatees- and executors on the spot, who minutely examined the conduct of the master.' If he acted negligently, they co.uld have complained to the court. But at a meeting of the parties, with their counsel, many years after, to settle the affairs of the estate (in 1791,) and whilst Thos, Fenwicke was still" alive, (who was then interested in this particular lot) and years before the complainants claim arose,-there was no complaint against the master ; but a report is drawn up and made to the court, and confirmed, by which his conduct was virtually approved. Great complaints are made about taking Maurice Simons’s bond as security from the Simpsons, (who held that bond) because the estate of Mr. Si-mons is insolvent : but it was then supposed to be a good estate ; and the master in his answer, swears that if M. Simons had been alive, he would have taken .him as personal security.. But it is objected that the assignment of this bond by one of the partners, was illegal* _ This is admitted ; but then the master is charges- *635 ¿le only with an error in judgment. Now on the autho-yity of'the cases cited, from 2 Vernon, 90, Comer vs. Hollinshead, and 1st. East. 555, Harman vs. Tappenden, and others, no bill in equity, or action at law can be maintained against a public officer for an error in judgment. That the master has never been deemed liable in a pecuniary yiew, for error in judgment is evident, from the question having never before been agitated in this court. His liability, at present, arises solely from the act of 1791, which obliges him to give security for his conduct; but that act is prospective, and cannot affect this case.
It is hardly necessary, after what has been said, to go into the second question, which is, .whether.'the master is liable in his ministerial or judicial capacity, by any misfear .sanee in thistcase; but examine it a little. • . In his ministerial character, he is bound strictly to follow the instructions. of the court.; If he does inore than he is advised to do, with a view to benefit the parties, he ought not to be censured for it. He is frequently a judicial officer. The determinations of this courtj the acts of assembly of 1721, Public Laws, p. 110, and of 17-16, p. 212, plainly evince him to be so. In this capacity, he is a judge, and exercises his mind in forming decisions, concerning the rights and interests of others. In this case his judicial powers were exercised only on the interests of others, as they generally are, except in cases of waste, and some few others. In his ministerial character, he was to sell the lot, and he did sell it, and is not liable on this ground. Next, as tq his judicial character. Although the master in most instances acts as a judge, yet it is always with an appeal tq the court. Therefore if he did not. exercise his judgment for the best, in deciding upon the interests of the estate of Edward Fenwicke, there were relations, legatees, trustees and executors to call him to account before the court; but from 1785, to .1791, this was neglected. He was suffered to follow his own - course, and in 1791, his conduct approved by the parties interested, and his report-confirmed by the court. But it is not clear that the mas *636 ter erred in judgment, for very circumspect persons might have considered the security sufficient; and no human foresight could have anticipated the failure of the securi-. ties. Under all the circumstances, the courtis of opinion on the merits of this case, and without adverting to the plea (of Statute of limitations) that the master is not liable to make good the difference of price, between the first sale (when Simpson purchased it) and the second sale, (when sold to .raise money for the payments of the first sale, and which was far short of the first price) of the lot in bill men*-tíóned, Bill dismissed with costs.